IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIMBERLEY MYERS,** | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO.   12-597 |
| v. | : | |
| | : | |
| **ANGELO C. MOORE, JOHN NORWOOD** | : | |
| **FISHER, and FISHBONE,** | : | |
| Defendants. | : | |

DuBois, J.                                                                                              February 12, 2014
                                                                                                 Amended  July 23, 2014

## M E M O R A N D U M

### I.      INTRODUCTION

This case arises out of an incident that took place at a performance by the musical group Fishbone on February 23, 2010, at the World Café Live venue in Philadelphia, Pennsylvania, during which Fishbone's lead singer, defendant, Angelo C. Moore ("Moore"), dove into the crowd, knocked plaintiff, Kimberly Moore, to the ground, and caused severe injuries.

Based on the following Findings of Fact and Conclusions of Law, judgment is entered in favor of plaintiff and against Moore and John Norwood Fisher ("Fisher"), jointly and severally, for compensatory damages, in the sum of $1,117,145.93, and judgment is entered in favor of plaintiff and against Moore, individually, for punitive damages, in the sum of $250,000.   Finally, the Court *sua sponte* dismisses with prejudice plaintiff's claims against defendant, Fishbone, pursuant to the Court's inherent power to dismiss actions for lack of prosecution and Federal Rule of Civil Procedure 41(b).

### II.     PROCEDURAL BACKGROUND

In 2010, plaintiff filed suit in this Court (the "first action") against (1) Moore, (2) Fisher,

who is Fishbone's bass player, (3) Fishbone, (4) Silverback Artist Management ("Silverback"), which is Fishbone's manager, (5) the Trustees of the University of Pennsylvania, (6) Behind Closed Doors Touring,[1] (7) Hajoca Associates, L.P.,[2] and (8) Real Entertainment — Philadelphia, Inc.,[3] for negligence in producing the February 23, 2010 concert at which plaintiff was injured and in failing to warn the audience that the concert would feature "stage diving." *See* Second Amended Complaint, *Myers v. Moore*, No 10-cv-824 (E.D. Pa. Dec. 20, 2010). Plaintiff also asserted claims of civil conspiracy against all defendants and assault and battery against Moore, Fisher, Fishbone, and Behind Closed Doors Touring.

Ultimately, plaintiff reached settlements with Silverback, the Trustees of the University of Pennsylvania, and Real Entertainment — Philadelphia, Inc. (the "settling defendants"). At plaintiff's request, the Court dismissed plaintiff's claims against the non-settling defendants, Moore, Fisher, Fishbone, and Behind Closed Doors Touring, without prejudice. Defendants, Moore and Fishbone, were represented in the first action, but defendants, Fisher and Behind Closed Doors Touring, were not represented in those proceedings.

On February 3, 2012, plaintiff brought the present action against (1) Moore, (2) Fisher, (3) Fishbone, (4) Fishbone's agent, The Agency Group, Ltd.,[4] and (5) Behind Closed Doors Touring, for negligence and civil conspiracy. Plaintiff also asserted claims of assault and battery against Moore, Fisher, Fishbone, and Behind Closed Doors Touring. The Complaint was properly served on Moore and Fisher on February 3, 2012. Moore and Fisher failed to respond to the Complaint

---

[1] Behind Closed Doors Touring is a general partnership formed by Moore and Fisher to operate Fishbone's tours.

[2] Hajoca Associates, L.P. subleases space to Real Entertainment — Philadelphia, Inc. for the operation of World Café Live.

[3] Real Entertainment — Philadelphia, Inc. is the owner and operator the World Café Live.

[4] On July 12, 2012, plaintiff stipulated to the dismissal with prejudice of her claims against The Agency Group, Ltd.

as required by law. Accordingly, a default was entered by the Clerk of Court against them on September 4, 2012. *See* Fed. R. Civ. P. 55(a). Although Fishbone failed to respond to the Complaint, plaintiff has not sought a default or a default judgment against it.

The matter was presented to the Court on Motion for Default Judgment Against Defendants John Norwood Fisher and Angelo C. Moore pursuant to Federal Rule of Civil Procedure 55(b). By Order dated April 4, 2013, the Court granted plaintiff's Motion for Entry of Default Judgment Against Defendants John Norwood Fisher and Angelo C. Moore.[5]

On May 6, 2013, the Court conducted a hearing to assess the damages that should be awarded to plaintiff. Notwithstanding notice to Moore and Fisher, they did not appear at the hearing. Following the hearing, plaintiff submitted Proposed Findings of Fact and Conclusions of Law and additional briefing, requested by the Court, on the issue of whether any assessment of damages against Moore and Fisher in the present action should be reduced by the amount of the settlements between plaintiff and the settling defendants in the first action.

### III. FINDINGS OF FACT

1. Plaintiff, a forty-six year old female, is, and was at the time the suit was instituted, a resident, citizen, and domiciliary of the State of New Jersey, residing at 3233 Avalon Court, Voorhees, New Jersey.

2. Plaintiff obtained her Bachelors of Science in Education from Bloomsburg University in 1988. In the fall of 2001, plaintiff enrolled in the Executive MBA Program at Drexel University, where she attended classes through 2003, while simultaneously working as a

---

[5] By that same Order, the Court denied plaintiff's Motion for Entry of Default Judgment Against Defendant Behind Closed Doors Touring on the ground that Behind Closed Doors Touring had not been properly served with process. On April 8, 2013, plaintiff filed a Praecipe to Dismiss Defendant Behind Closed Doors Touring from this action.

director of an educational institute.  Plaintiff was two courses short of completing the Executive MBA Program when she dropped out because "[her] priorities changed."  Non-Jury Trial Tr. 20:14, May 6, 2013, ECF No. 25.

3. Since 2008, plaintiff has worked as the Director of Operations and Business Development at Comprehensive Clinical Research, which conducts pharmaceutical clinical trials.  Her responsibilities include generating new business, reviewing contracts, budgeting, overall business management, and general marketing and website monitoring.

4. Defendant Moore is, and was at the time the suit was instituted, a citizen of the State of California, residing at 24354 Hatteras Street, Woodland Hills, California.  He is the lead singer and a principal of Fishbone.

5. Defendant Fisher is, and was at the time the suit was instituted, a citizen of the State of California, residing at 1659 Ocean Front Walk, Santa Monica, California.  He is the bass player and a principal of Fishbone.  Fisher has the final word on band decisions and is responsible for, *inter alia*, "hand[ling] the day-to-day business of the band," *see* Fisher Dep. at 12:2, Feb. 20, 2011, ECF No. 28-21, which includes meeting with concert-venue personnel to discuss safety and security.

6. Moore and Fisher are general partners of Behind Closed Door Touring, which maintains its business address at 1013 Orange Drive, Los Angeles, California.  Behind Closed Doors Touring does business under the name of "Fishbone" and was formed by Moore and Fisher to operate Fishbone's tours.  It is unknown whether Fishbone is a separate partnership, joint venture, *de facto* partnership, *de facto* joint venture, or other form of association.

7. Since the 1980s, Fishbone's band members have partaken in "stage diving," a practice in which a band member dives from a stage or other elevated platform into the audience.

Moore continues, even after the incident in question, to stage dive at "pretty much" every performance. Moore Dep. at 13:11-12, Feb. 20, 2011, ECF No. 28-19. Moore and Fisher also use stage diving to publicize the band, such as by including stage-diving images on album covers and promotional t-shirts.

8. Moore does not warn audience members before he dives from a stage because he believes that such warnings would make his performances less exciting. *See, e.g.*, *id.* at 55:4-14 ("[I]f I tell the audience, that gives away the whole . . . theatrics or the spontaneity. People want to be on the edge when they go to a Fishbone show . . . . They want to feel the power and the feeling of the music and the vibe.").

9. At the time of the incident in question, Moore and Fisher both knew that stage diving poses a serious risk of harm to audience members. During his deposition on February 20, 2011, Moore testified that every couple of months an ambulance is called to the concert venue and that Moore "usually . . . can see . . . a dead spot" in the audience with "a lot of [surrounding] security" after someone is injured. *Id.* at 60:9-61:1. Further, as of the date of the incident in question, both Moore and Fisher were aware that Moore previously had been sued by an audience member who Moore injured while he was stage diving during a Seattle concert.

10. Despite that Moore is — and was at the time of the incident in question — well aware of the risk that his conduct poses to audience members, Moore's primary concern when he is stage diving is with own safety[6] and with the potential for what Moore believes to be frivolous

---

[6] For example, when asked during his deposition what he views to be the "risk" of stage diving, Moore responded, "The risk that you might hit the floor." Moore Dep. at 126:22-23, Feb. 20, 2011, ECF No. 28-19; *see also id.* at 52:1-53:21 (stating that he tries to jump into a crowd of as many people as possible to minimize his own chances of injury).

lawsuits filed by "predators."[7]  Moore does not concern himself with audience members' safety because he believes that allowing such thoughts to cloud his mind would "affect[] [his] performance of really letting [himself] go."  *Id.* at 22:19-20.  Further, Moore makes no "true valid effort" to contact or inquire about an audience member who has been injured during a performance "because after the show is over, . . . [he] leave[s] the last city behind and [he] go[es] to the next one."  *See id.* at 84:12-20.

11. On February 23, 2013, plaintiff attended a musical performance at the World Café Live venue in Philadelphia, Pennsylvania.  Plaintiff did not know that Fishbone would be performing the concert's opening act, and she had no reason to anticipate any stage diving.

12. When deposed on February 11, 2008, Moore invoked the Fifth Amendment privilege against self-incrimination in response to the question of "whether or not [he] did any drugs for the World Café Live show on February 23, 2010."  *Id.* at 77:22-24.  The Court infers from Moore's invocation of the Fifth Amendment that his testimony would have been unfavorable to his interests.

13. Neither Moore nor Fisher took any action to alert plaintiff or other audience members who attended Fishbone's February 23, 2010 concert of the fact that the band's performance might involve stage diving.

---

[7] Moore Dep. at 57:11-12 ("After [the] Shockley [lawsuit] I thought to myself, it's predators out there, man, there's predators to me.");  *see also, e.g.*, *id.* at 19:2-6 ("The authenticity of my performance is cramped because I have this thing going on in the back of my head if there's somebody out there that's trying to metaphorically step in front of the car so that they can get hit so they can make a bunch of money."); *id.* at 19:15-20:2 ("[W]hen you're performing, . . . you don't want to have anything stepping in your way of — of you expressing your true feelings and your true art . . . . I've got this thing that's stepping in my way, what if somebody's out there, somebody's out there that's trying to sue me, what if there's somebody out there in the front row that's not there to have fun, but they're there to make money.").

14.     Part of the way through the Fishbone performance, Moore intentionally dove, without warning, from the elevated stage into the crowd, knocking plaintiff to the ground. Plaintiff hit her head on the floor and thereafter lost consciousness.  Moore and Fisher continued to perform as if nothing had happened.

15.     Plaintiff was transported by ambulance from the concert venue to the Hospital of the University of Pennsylvania (HUP).  HUP medical personnel diagnosed plaintiff with a skull fracture at the temporal bone, a ruptured eardrum, and a fractured clavicle.  The stage-diving incident also caused plaintiff to suffer from a host of shoulder-related orthopedic injuries, traumatic brain injuries, auditory injuries, and post-traumatic autoimmune disorders, many of which persist to this date.

16.     Plaintiff first attempted to treat her fractured clavicle through non-surgical interventions, including steroid injections, physical therapy, and medication management, however, such conservative treatments proved ineffective in controlling her pain.  Plaintiff therefore turned to surgery to address her fractured clavicle and its complications.  To date, plaintiff has undergone (1) an open reduction and internal fixation surgery; (2) a surgery to remove plaintiff's right clavicle plate and screws along with diagnostic arthroscopy; and (3) a breast-reduction surgery to reduce the pressure on plaintiff's right shoulder.  These surgeries have left plaintiff with scars extending from her shoulder into her right chest.

17.     Even after undergoing three surgeries, plaintiff's clavicle fracture has not healed, and she continues to experience pain, weakness, and motion limitation in her right shoulder. Plaintiff likely "will have permanent function restriction of the right shoulder as a result of the clavicle fracture and subsequent surgical intervention."  Vito Anthony Loguidice, M.D. Report at 0015, May 18, 2011, ECF No. 28-3.  Plaintiff also has developed thoracic outlet syndrome, which

causes her constant nerve pain radiating from the top of her right shoulder into the fingers on her right hand and will require her to undergo thoracic outlet surgery in the near future.

18.     The stage-diving incident has caused plaintiff to suffer from traumatically-induced autoimmune disorders, which have progressed to lupus.   Her symptoms include high blood pressure, joint pain, stiffness, fatigue, hair loss, photosensitivity, difficulty swallowing, night sweats, insomnia, and oral and nasal ulcers.   Plaintiff has received steroid injections to manage these symptoms, but there is evidence that many of these symptoms, including her painful and degenerative arthritis, will persist indefinitely.

19.     During the incident in question, plaintiff also suffered a traumatic right temporal bone fracture and cerebral concussion.   As a result, plaintiff experiences permanent mild hearing loss, tinnitus, aural fullness, headaches, and imbalance.

20.     In addition to physical injuries, the incident caused plaintiff significant cognitive deficits, including difficulties with memory, attention, word-finding and spelling, information processing, and auditory-verbal learning and recall.   These cognitive difficulties have hindered plaintiff's productivity and confidence in the workplace and her ability to serve as the sole provider and caretaker of her three children, who were ages seventeen, fifteen, and thirteen at the time of her injuries.   Plaintiff now struggles to remember important conversations, to manage her children's schedules, and to complete necessary business-related travel unaccompanied by her daughter.   These cognitive and neurological defects have caused plaintiff considerable embarrassment and anxiety.

21.     Plaintiff has incurred $15,845.97 in out-of-pocket expenses for the treatment of injuries, and associated complications, sustained on February 23, 2010.   This medical care and

treatment is reasonable and necessary, and the charges for that treatment are reasonable and customary for the services in the area where the services were rendered.

22. Plaintiff is estimated to have future lifetime costs for the management of her conditions totaling $351,299.96, including the estimated cost of surgery to address her thoracic outlet syndrome. These estimated costs are fair and reasonable and do not duplicate any of the prior out-of-pocket expenses that plaintiff has incurred to date.

23. Plaintiff lost no wages, benefits, or compensation as a result of her injuries.

## IV. CONCLUSIONS OF LAW

24. The Court has jurisdiction based upon diversity of citizenship. 28 U.S.C. § 1332.

25. The Court *sua sponte* dismisses with prejudice plaintiff's claims against defendant, Fishbone, pursuant to the Court's inherent power to dismiss actions for lack of prosecution and Federal Rule of Civil Procedure 41(b).

26. Liability against Moore and Fisher for negligence, assault, battery, civil conspiracy, and aiding and abetting has been established through the issuance of a default pursuant to Federal Rule of Civil Procedure 55. *See, e.g.*, *Belmonte v. Spitzer*, No. 09-cv-4715, 2010 WL 2195651, at *1 (D.N.J. May 27, 2010) ("Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint."); *Transportes Aereos de Angola v. Jet Traders Inv. Corp.*, 624 F. Supp. 264, 266 (D. Del. 1985).

27. A default judgment, however, "does not establish liability for the amount of damages claimed by the plaintiff." *Belmonte*, 2010 WL 2195651, at *1. "If the damages are not for a 'sum certain or for a sum which can by computation be made certain,' the 'court may conduct such hearings or order such references as it deems necessary and proper.'" *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) (citation omitted) (quoting Fed. R. Civ. P.

55 (b)(1)-(2)).

### A. Calculation of Compensatory Damages

28.     Plaintiff has established that, both as general partners and as members of a single civil conspiracy, Moore and Fisher are jointly and severally liable for the full amount of compensatory damages awarded by the Court.  *See Loughman v. Consol-Pa. Coal Co.*, 6 F.3d 88, 100 (3d Cir. 1993) (noting that defendants who are liable for civil conspiracy are jointly and severally liable for all compensatory damages resulting from that conspiracy); *Sleasman v. Brooks*, 32 Pa. D. & C.3d 187, 194-95 (Pa. Com. Pl. 1984) ("Partners and members of a joint enterprise or joint venture are jointly and severally liable in tort.").

29.     First, plaintiff is entitled to compensation for "all medical expenses reasonably incurred for the diagnosis, treatment, and cure of her injuries," *see* Pa. Suggested Standard Civil Jury Instructions § 7.20 (2013), and "all future medical expenses reasonably likely to be incurred for the treatment and care of h[er] injuries," *Durosky v. United States*, No. 07-cv-1828, 2008 WL 5104850, at *7 (M.D. Pa. Dec. 1, 2008) (quoting *DeCarlo v. United States*, No. 00-cv-1059, 2002 WL 31499281, at *29 (M.D. Pa. Sept. 11, 2002)).[8]

30.     The Court awards plaintiff $15,845.97 as compensation for her prior medical expenses and $351,299.96 as compensation for her future medical expenses.

31.     Second, plaintiff is entitled to an award of noneconomic damages for past and future "(1) pain and suffering; (2) embarrassment and humiliation; (3) loss of ability to enjoy the

---

[8] While damages for past medical expenses are "'limited to those expenses that 'have been actually paid, or such as, in the judgment of the jury, are reasonably necessary to be incurred,'" courts have "rejected attempts to limit medical expenses based on current insurance contribution rates."  *Watts v. Hollock*, No. 10-cv-92, 2011 WL 6026998, at *10 (M.D. Pa. Dec. 5, 2011) (quoting *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786, 789 (Pa. 2001)).

pleasures of life; and (4) disfigurement." Pa. Suggested Standard Jury Instructions § 7.130 (2013); *see also Vogelsberger v. Margee-Womens Hosp. of UPMC Health Sys.*, 93 A.3d 540, 555 (Pa. Super. Ct. 2006).

32. As set forth above, plaintiff's injuries are severe and have caused her constant pain and permanent damage, including permanent hearing loss and cognitive difficulties. Plaintiff has undergone three surgeries for her clavicle injury, which have left her with unsightly scars, and she plans to undergo, in the near future, a fourth surgery to treat her thoracic outlet syndrome. Plaintiff's other injuries, many of which are expected to be permanent, have similarly necessitated significant medical treatment, led to considerable embarrassment, and interfered with her activities of daily living and her ability to enjoy life's pleasures.

33. The Court concludes that an award of $750,000 will reasonably compensate plaintiff for these past and future noneconomic damages.

34. Plaintiff also argues that she is entitled to an additional award to compensate her for her diminished future earnings potential because her injuries have rendered her no longer physically and cognitively able to complete the Executive MBA Program that she began in the fall of 2001.[9] The Court concludes that there is no basis to award plaintiff damages for a loss of these future earnings. These damages are too speculative given that plaintiff attended the Executive MBA Program over a decade ago, she left the program because "[her] priorities changed," *see* Non-Jury Trial Tr. 20:14, and there is insufficient evidence that she would have pursued her MBA degree absent her injuries. *Cf. Waldorf v. Shuta*, 896 F.2d 723, 743 (3d Cir. 1990) (holding that the district court erred in admitting evidence regarding the plaintiff's future earning potential as an

---

[9] Plaintiff has submitted an expert Vocational Report from Robert P. Wolf, Ed.D. MBA, who estimated the total resulting economic loss to be $184,842.

attorney where "[a]t the time of the accident, [the plaintiff] did not possess the qualifications, and it [was] not at all certain that he would have been admitted to law school").

### B. Calculation of Punitive Damages

35. Under Pennsylvania tort law, a court may award punitive damages "for conduct that is outrageous, because of defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam*, 485 A.2d 742, 747-48 (Pa. 1984) (quoting *Restatement (Second) of Torts* § 908(2) (1979)). In awarding punitive damages, the Court must consider: (1) the character of the act, (2) the nature and extent of the harm, and (3) the wealth of the defendant.[10] *See, e.g.*, *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 740 (3d Cir. 1991); *Restatement (Second) of Torts* § 908.

36. The Court need not award punitive damages jointly and severally. *Loughman*, 6 F.3d at 101 ("[R]egardless of whether punitive damages may be assessed jointly and severally under Pennsylvania law, we have found no currently applicable law suggesting that they must be awarded jointly and severally.").

37. The Court concludes that punitive damages should be assessed solely against Moore. Moore, who refused to answer questions at his deposition regarding his use of illicit drugs on the date of the incident in question, intentionally dove from an elevated stage despite knowing that stage diving in and of itself poses a serious risk of harm to audience members. Further, Moore exhibits little remorse or impetus to change his conduct. *Kelvin Cryosystems, Inc. v. Lightnin, a Div. of SPX Corp.*, No. 03-cv-00881, 2005 WL 2994693, at *11 (E.D. Pa. Sept. 28, 2005) ("We note that Mr. Arencibia did not express any remorse for his conduct or provide any

---

[10] In this case, because Moore and Fisher failed to enter an appearance, plaintiff has presented no evidence of their wealth. However, "evidence of wealth is not mandatory to establish a claim for punitive damages." *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 215 (Pa. Super. Ct. 2003).

assurance that he would refrain from similar conduct in the future. One of the purposes of punitive damages is to help ensure that wrongdoers not only comprehend the wrongfulness of their actions, but to deter future bad conduct."), *aff'd sub nom. Kelvin Cryosystems, Inc. v. Lightnin*, 252 F. App'x 469 (3d Cir. 2007). Moore continues to stage dive at almost every performance and exhibits nothing but apathy and hostility towards his victims, whom he repeatedly characterized, during his deposition, as "predators" out to steal his money.

38. The Court concludes that Moore's conduct warrants an award of punitive damages in favor of plaintiff and against him of $250,000.

### C. Apportionment of Liability and Set-Off

39. Plaintiff contends that Moore and Fisher are not entitled to a set-off against the damages awarded in the present action as a result of settlements that plaintiff entered into in the first action. The Pennsylvania Uniform Contribution Among Tortfeasors Act ("UCATA") provides:

> [a] release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa. Cons. Stat. Ann. § 8326.

40. In order for UCATA to apply, however, "it is necessary to establish that those allegedly culpable are joint tortfeasors." *Rocco v. Johns-Manville Corp.*, 754 F.2d 110, 114 (3d Cir. 1985). The Court may ascertain joint tortfeasor status by a variety of methods, including adjudication, a suit for contribution, or a so-called "*Griffin* release," in which the settling parties concede joint tortfeasor liability. *See id.* at 114-15; *see also Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974).

41. The right to apportionment or contribution is an affirmative defense, the burden of which rests with the party by whom it is sought. *See, e.g.*, *Martin & Owens-Corning Fiberglass Corp.*, 528 A.2d 947, 949 (Pa. 1987); *Wade v. S.J. Groves & Sons Co.*, 424 A.2d 902 (Pa. Super. Ct. 1981). A nonsettling defendant's failure to either "request[] substitution of *Griffin*-type releases or judicial determination of liability. . . . may be considered a waiver of any benefit from the . . . releases [executed by the settling defendants] or the amounts paid for them." *Rocco*, 754 F.2d at 115; *cf. Godfrey v. Soto*, No. 06-cv-428, 2007 WL 2693652, at *7 (E.D.N.Y. Sept. 10, 2007) ("The few New York courts confronted with a non-settling defendant who has defaulted have decided that the windfall should not accrue to the benefit of the party who has refused to participate in litigation.").

42. If joint tortfeasor status is not established, the released party is "considered a volunteer," and "the amount paid for the release is not deducted from the recovery against a nonreleased party." *Rocco*, 754 F.2d at 115; *see also id.* ("The amount paid by Group A defendants should not have been deducted from the verdicts, because as to them there was no adjudication of liability nor had they executed joint tortfeasor releases.").

43. In this case, the settling defendants did not execute *Griffin* releases in which they conceded their status as joint tortfeasors. Rather, each of the settling defendants signed a release stating that plaintiff shall reduce her total claims against "other joint tortfeasors in a *pro rata* reduction" *only if* it is "judicially determined that the Releasees and any other person or entity are [in fact] joint tortfeasors." Because Moore and Fisher failed to appear, they never sought a judicial determination as to whether the settling defendants were joint tortfeasors. Accordingly, the payments of the settling defendants must be deemed those of volunteers and cannot support a

claim for contribution or pro rata reduction.

      An appropriate order follows.